UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| S. A. T., a minor by her mother, CONSUELO T. JUAREZ, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) Cause No. 1:12-cv-1697-WTL-TAB ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

### ENTRY ON JUDICIAL REVIEW

Plaintiff's mother, Consuelo T. Juarez, requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Supplemental Social Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). The Court now rules as follows.

### I. PROCEDURAL HISTORY

Juarez filed an application for SSI on July 20, 2009, alleging that her minor daughter, S.A.T., became disabled on February 14, 2009. The application was initially denied on October 29, 2009, and again upon reconsideration on January 27, 2010. Thereafter, S.A.T.'s mother requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on May 12, 2011, before ALJ Charles W. Ardery in Indianapolis, Indiana. During the hearing, Georgia Ann Pitcher, Ph.D., a child clinical and school psychologist, testified as a medical expert. On August 16, 2011, the ALJ issued a decision denying Jaurez's application for benefits. The Appeals Council upheld the ALJ's decision and denied a request for review on September 18, 2012. This action for judicial review ensued.

## II.      EVIDENCE OF RECORD

The relevant medical evidence of record follows.

### A.  Wishard Cottage Corners Health Center/Midtown Community Mental Health Clinic

In 2008, Dr. Mark Tirtilli, at the Wishard Cottage Corners Health Center, diagnosed S.A.T. with Attention Deficit Hyperactivity Disorder ("ADHD") and prescribed her various drugs, including Ritalin and Concerta, to treat the symptoms. Eventually, Dr. Tirtilli referred S.A.T. to Midtown Community Mental Health Clinic for a psychiatric consult regarding S.A.T.'s behavior problems.

On March 17, 2009, Dr. Tirtilli noted that S.A.T. was "doing better at school," while on the medication, but still had "impulsivity/mood instability starting at 7 pm." Tr. at 210. By April 14, 2009, however, Dr. Tirtilli noted that S.A.T. was "doing better both at home and at school." *Id.* at 207.

On March 11, 2010, S.A.T. underwent an initial consultation at the Midtown Community Mental Health Clinic with Deborah Stamper, a clinical nurse specialist. Stamper noted that S.A.T. was an honor roll student in the third grade with no behavioral problems at school. She further reported that S.A.T. "has had irritability since her father left, but [is] more angry when tormented by her Mother's boyfriend's 4 year old son." *Id.* at 244.

On March 28, 2010, Jaurez reported to Stamper that S.A.T.'s hyperactivity was in remission. S.A.T., however, continued to be very angry and irritable. Stamper diagnosed S.A.T. with anxiety and a depressive disorder combined with ADHD. S.A.T. was also prescribed Zoloft to treat her depression.

On November 11, 2010, Jaurez reported to Midtown social worker, Pamela O'Brien, that she was "concerned about inappropriate 'embarrassing' behavior, sometimes of a sexual nature,

2

as well as mood swings." *Id.* at 247. She wanted advice on "how to deal with [S.A.T.'s] behavior without yelling at her." *Id.*

S.A.T. and her mother met with O'Brien on November 19, 2010. After the visit, O'Brien opined as follows:

> [S.A.T.] is reacting aggressively to what she perceives as a chaotic family that does not meet her emotional needs. She is able to express her feelings verbally and states that she wants to have more control over herself so that she can feel better about herself and so that her siblings will want to take her places.

*Id.*

On December 16, 2010, after noting that S.A.T. continued to be irritable and argumentative, Stamper increased S.A.T.'s Concerta dosage and continued her prescription for Zoloft.

On February 19, 2011, Stamper reported that S.A.T. was not doing well in school. S.A.T. was sad that she may have to repeat the 4th grade. A report from her teacher indicated that she talked too much and was not completing her assignments on time. Stamper recommended that the family begin consistent counseling with O'Brien.

Less than a month later, on March 6, 2011, Stamper noted that S.A.T.'s grades had improved and she was making a "much greater effort at school." *Id.* at 249. She was, however, "having peer ridicule and peer troubles." *Id.*

Over the next several weeks, Jaurez continued to complain about S.A.T.'s behavior; she reported that S.A.T. threw temper tantrums, had screaming fits, and talked out of turn at school. After several medication and dosage changes, however, S.A.T.'s mother reported on April 11, 2011, that "[S.A.T. was] doing very well and receiving excellent reports from school. She [was] not irritable or oppositional." *Id.* at 252. S.A.T.'s mother attributed the improvement to the Concerta.

3

### B. Mental Status Examination/State-Agency Reviews

On October 8, 2009, S.A.T. underwent a mental status examination with Greg Lynch, Ph.D. Dr. Lynch opined that S.A.T. suffered from ADHD and assigned her a Global Assessment of Functioning ("GAF") Score of 51-53. Dr. Lynch further concluded that S.A.T.'s medication was "beneficial," and "[t]he prognosis for [S.A.T.'s] improvement seem[ed] fair to good with appropriate mental health intervention." *Id.* at 228.

On October 27, 2009, Randal Horton, Psy.D., reviewed S.A.T.'s records and completed a Childhood Disability Evaluation Form. He opined that S.A.T. had no limitations in acquiring and using information, interacting and relating with others, moving about and manipulating objects, caring for herself, and with regard to her health and physical well-being. Due to S.A.T.'s ADHD, however, she had less than marked limitations in attending and completing tasks.

On January 27, 2010, state-agency doctor, Joelle Larsen, Ph.D., also completed a Childhood Disability Evaluation Form and opined that S.A.T. had no limitations in acquiring and using information, moving about and manipulating objects, caring for herself, and with regard to her health and physical well-being. S.A.T., however, had less than marked limitations in attending and completing tasks and interacting and relating with others.

### C. Teacher/School Reports

In September 2009, while S.A.T. was in third grade, S.A.T.'s second grade teacher completed a Teacher Questionnaire and reported that S.A.T. "struggled with working independently in the classroom. She worked well with the teacher's guidance, yet was challenged with comprehending verbal directions and following." *Id.* at 144. The teacher further reported that S.A.T. "demands much of the teacher's attention. Recess has been taken away and [she has been removed] from the classroom. [She requires c]onstant verbal reminders to keep her

4

focused." *Id.* at 146. S.A.T. however, "is able to focus and complete tasks much quicker and completely when medicated." *Id.* at 149.

> That same month, the school social worker indicated that S.A.T.
>
> is a very intelligent child who is at grade level in all areas of functioning. Her attention span and concentration are good with the aid of mediation and she can focus without any problem. She is a self motivated child who does her work independently and to date has had perfect attendance. Furthermore, she is NOT a behavior problem at all! Her mother told the teacher . . . that the reason that she applied for SSI is so she can get the money to send her to Catholic School!

*Id.* at 151 (emphasis in original). The school resource teacher further indicated that S.A.T. was "in a regular [education] classroom with no behavior problems." *Id.* at 223.

The following year, in August 2010, S.A.T.'s fourth grade teacher noted that S.A.T. talked too much during class and often failed to complete her assignments on time. The teacher reported in November 2010, that S.A.T. was reprimanded for chewing gum and playing with pencils. S.A.T. was also earning below-average grades. On her November 29, 2010 midterm report, her grades were as follows:

| Reading | D | English | C |
|---|---|---|---|
| Spelling | C | Social Studies | F |
| Handwriting | B | Science | A |
| Math | D | | |

As the year progressed, S.A.T.'s teacher continued to complain about S.A.T.'s excessive talking during class. Additionally, S.A.T.'s grades remained low. On February 16, 2011, S.A.T.'s midterm report listed the following grades:

| Reading | D | Health | A |
|---|---|---|---|
| Spelling | C | English | B |
| Math | F | Social Studies | F |

5

The teacher also reported that S.A.T. was

> having trouble staying focused on her work in the classroom. She often talks to classmates or plays with objects in her desk . . . This draws attention away from the skills being taught, and then she has difficulty with the written lessons related to the skill. . . . During lessons I remind [S.A.T.] numerous times each day to listen and pay attention and focus on her work or the lesson. Her response is usually positive and cooperative, but she sometimes makes excuses or gives reasons to support what she is doing. . . . Often when I give instructions to the entire class [S.A.T.] does not hear me and asks me later what she is supposed to be doing. These behaviors are contributing to lower grades for [S.A.T.] and slow progress toward academic goals.

*Id.* at 281.

On April 13, 2011, an inclusion teacher[1] at S.A.T.'s school reported that S.A.T. had extreme limitations in attending and completing tasks, marked limitations in interacting and relating to others, and less than marked limitations in acquiring and using information, moving about and manipulating objections, caring for herself, and with regard to her health and well-being. The teacher did, however, note that S.A.T. exhibited "noticeable improvement" over the last several weeks. *Id.* at 284.

On April 14, 2011, S.A.T.'s fourth grade teacher reported that S.A.T. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating to others, and moving about and manipulating objections. She had no limitations in caring for herself or with regard to her health and well-being. S.A.T.'s fourth grade teacher also noted that S.A.T.'s behavior had "changed drastically during the past two weeks." *Id.* at 285. She was "calm and more attentive in class" and "no longer disruptive." *Id.*

---

[1] S.A.T. stated during the hearing that the inclusion teacher did not regularly work with her and was in the classroom to help the special education students.

### D. Hearing Testimony

#### 1. Jaurez

Jaurez testified that she applied for social security on behalf of her daughter because "she's very hyper. She was diddling in school and talking and screaming and arguing at home and at school." *Id.* at 39. She also stated that S.A.T. had trouble sleeping through the night and was often worried that someone would break into the house. She further reported that S.A.T. was defiant when asked to do chores and had problems controlling her anger, especially when her brothers and sisters bothered her and her things.

#### 2. Dr. Pitcher

Dr. Pitcher testified that she reviewed Listings 112.11, ADHD, and 112.04, Mood Disorders in Children, but that S.A.T. did not suffer from a severe impairment or combination of impairments. Dr. Pitcher clarified, however, that S.A.T. would have a severe impairment without treatment, but that her ailments were under control with medication.

### III. APPLICABLE STANDARD

To be eligible for SSI, a claimant must meet the requirements of 42 U.S.C. § 423. Pursuant to that statute, "disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The standard is a stringent one. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *See Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).

In determining whether a claimant under the age of eighteen is disabled, the Commissioner employs a three-step sequential analysis. 20 C.F.R. § 416.924(a). At step one, if

the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition. 20 C.F.R. § 416.924(b). At step two, if the claimant does not have a "severe" impairment or a combination of impairments that is "severe," she is not disabled. 20 C.F.R. § 416.924(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals any impairment that appears in the Listing of Impairments, codified at 20 C.F.R. pt. 404, subpt. P, App. 1. 20 C.F.R. § 416.924(d). If the claimant has an impairment or combination of impairments that meets, medically equals, or functionally equals the listings, and meets the twelve-month duration requirement, the claimant is deemed disabled. 20 C.F.R. § 416.906.

In determining whether an impairment functionally equals the listings, the ALJ must examine the following domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). The claimant's impairment or combination of impairments must result in "marked" limitations in two or more domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). A "marked" limitation is one that seriously interferes with the claimant's ability to sustain and complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that very seriously interferes with the claimant's ability to sustain and complete activities. 20 C.F.R. § 416.924a(e)(3)(i).

On review, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and the

Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Rather, the ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while "[he] is not required to address every piece of evidence or testimony," [he] must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1177.

## IV.     THE ALJ'S DECISION

At step one, the ALJ found that S.A.T. had not engaged in substantial gainful activity since June 22, 2009, the application date. At step two, the ALJ concluded that S.A.T. suffered from the following severe impairments: ADHD and depression. At step three, the ALJ determined that S.A.T. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the listings. Accordingly, the ALJ concluded that S.A.T. was not disabled as defined by the Act from June 22, 2009, through the date of his decision.

## V.     DISCUSSION

Juarez advances two objections to the ALJ's decision; both arguments are addressed below.

### A. Lack of Substantial Evidence to Support ALJ's Decision

Jaurez argues that "substantial evidence fails to support the ALJ's Step 2 determination that the claimant was not disabled because her combined [ADHD] and depression was not a

9

severe impairment." Pet.'s Br. at 12, Dkt. No. 16. Jaurez maintains that the ALJ ignored or mischaracterized various items in the record. This argument, however, is without merit. Indeed, an ALJ need not discuss every piece of evidence in his disability decision. *See Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995). Rather, as noted above, the ALJ must simply "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Scheck,* 357 F.3d at 700. In this case, the ALJ did just that.

The ALJ noted that S.A.T. suffered from ADHD and depression, and that these ailments caused various behavioral issues, including excessive talking and irritability. However, as of April 2011, S.A.T.'s teachers and treatment providers indicated that S.A.T. had improved "drastically," and her symptoms were under control with medication. Dr. Pitcher also testified to this fact during the hearing. Because S.A.T.'s symptoms were controlled by medication, the ALJ concluded that S.A.T.'s ADHD and depression were not severe impairments.

Jaurez implies that Dr. Lynch's Mental Status Evaluation, assessing S.A.T. with a GAF Score of 51-53, belies this fact, and the ALJ's failure to note his conclusion requires reversal. Dr. Lynch's report, however, is consistent with the ALJ's decision. In this regard, Dr. Lynch opined in October 2009, that S.A.T.'s medication was "beneficial," and "[t]he prognosis for [S.A.T.'s] improvement seem[ed] fair to good with appropriate mental health intervention." Tr. at 228. Thus, Dr. Lynch's report does not contain evidence that is contrary to the ALJ's decision such that the ALJ's failure to specifically discuss the report was improper.

Jaurez further argues that S.A.T.'s ADHD and depression symptoms do, in fact, meet or functionally equal Listing 112.04, Mood Disorders, and Listing 112.11, ADHD.[2] Both Listings require "medically documented" evidence. *See* Listings 112.04 and 112.11. Jaurez, however,

---

[2] This argument appears to relate to the ALJ's determination at Step 3 rather than Step 2.

10

fails to cite any *medical evidence* in the record suggesting that these Listings are indeed met. Rather, Jaurez points to the report issued by an inclusion teacher at S.A.T.'s school indicating that S.A.T. does, in fact, have various extreme and marked limitations. Such a report, however, is not an appropriate indicator that the listings are met.

In sum, the ALJ properly articulated his reasoning for finding S.A.T.'s ADHD and depression to be non-severe impairments, and his determination is substantially supported by the medical evidence of record.

### B.  Credibility Determination

Additionally, Jaurez argues that the ALJ's credibility determination was "patently erroneous" because it was "contrary to the evidence and contrary to Social Security Ruling 96-7p." Pet.'s Br. at 18. The Court does not agree.

In determining credibility, an ALJ must consider several factors, including the claimant's daily activities, level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); S.S.R. 96–7p, and justify his finding with specific reasons. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). "Furthermore, the ALJ may not discredit a claimant's testimony . . . solely because there is no objective medical evidence supporting it." *Id.* (citations omitted). District courts "afford a credibility finding 'considerable deference,' and overturn [a finding] only if 'patently wrong.'" *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Carradine v. Barnhart*, 36 F.3d 751, 758 (7th Cir. 2004)).

In this case, the AJL opined as follows:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the allegations concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant has no severe impairment or combination of impairments . . .

Tr. at 17.

Jaurez faults the ALJ for using boilerplate language to explain his rejection of S.A.T.'s reported symptoms. The Court shares in the sentiments expressed in several recent Seventh Circuit opinions regarding the meaninglessness of certain Social Security "templates," similar to the one used here. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012). That being said, the ALJ listed S.A.T.'s reported symptoms and limitations and discussed the relevant medical evidence in the record. The ALJ also noted that S.A.T. had shown significant improvements while on medication, and focused on the recent non-medical reports issued by S.A.T.'s teachers. After considering this evidence, the ALJ concluded that S.A.T.'s symptoms were not as severe as Jaurez alleged. In light of the foregoing, the Court does not find the ALJ's credibility determination to be patently wrong.[3]

## VI.   CONCLUSION

In this case, the ALJ satisfied his obligation to articulate the reasons for his decision, and that decision is supported by substantial evidence in the record. Accordingly, the decision of the ALJ is **AFFIRMED**.

SO ORDERED: 12/11/2013

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[3] Jaurez also argues that that the ALJ's failure to consider S.A.T.'s GAF score of 51-53 in relation to the credibility determination was "contrary to his duty." Pet. Br. at 18. Again, however, Dr. Lynch's report is not contrary to the ALJ's decision. Moreover, the ALJ was under no specific duty to consider Dr. Lynch's report in relation to his credibility determination.